Estate of Hahn: Boyd and others, Appellants, v. Estate of Simon and another, Respondents.

*December 4, 1958—January 2, 1959.*

For the appellants there were briefs and oral argument by *Herbert W. Johnson* of Sturgeon Bay.

For the respondents there was a brief and oral argument by *Thorval T. Toft* of Sturgeon Bay.

WINGERT, J. The judgment will be affirmed. Some of the items in controversy present very close questions, but we are not convinced that the trial court erred in the disposition of any of them.

1. *Cash at store.* It is fairly clear, we think, that the gift of the undertaking *business* and the furniture *business* to Tony Simon included the $260.84 of cash at the store. That fund comprised receipts of the business which had not yet been deposited in the bank. In order to operate, a mercantile business must have a small supply of currency and coin at hand to make change; and in such a business, money commonly comes in after the daily bank deposit has been made and is held until banking hours the next day. In ordinary conception such money is an integral asset of the business and is presumably included in a transfer of the business, in the absence of something to indicate a contrary intent. Nothing in the codicil or in the surrounding circumstances suggests any reason why it should not be included. The fact that testator sometimes took money out of the till for his personal expenses does not show any probability that he would not have wanted Simon to have the cash at his death had he thought of it.

2. *Furnace bill.* We have no difficulty in sustaining the determination that this indebtedness should not be charged against the gift to Mr. Simon. The furnace was a more or less permanent improvement, and doubtless became a part

of the real estate which was devised to the nieces Barbara and Catharine. While the business was conducted in that real estate, another part of the building was used for residential purposes apart from the business. Where the landlord-tenant relationship exists with respect to a part of a building, and the owner occupies the rest of it, the cost of a new heating plant would normally be paid by the landlord. Viewing the business as a separate entity, testator must have contemplated when he bequeathed it to Simon, that the business was in a position comparable to that of tenant. We cannot believe that he wanted to impose the normal burdens of the landlord on the recipient of the business. While the codicil gave Simon the first option to rent the space occupied by the store and undertaking parlors at a rental to be determined as therein provided, there is nothing to indicate any intention that Simon pay expenses of improvement and upkeep of the building as well as a fair rent.

Appellants argue that since Simon ordered the furnace installed, and depreciation on the previous furnace had been treated as a business expense in testator's income-tax returns, a pattern had been set of considering the furnace as part of the business enterprise. We do not consider these factors controlling as against the natural presumption that the expense of replacing an essential and integral part of the real estate is to be charged against the ownership interest rather than against the occupant of only a part of the premises. At the time the furnace was ordered by Simon testator was physically unable to look after his affairs, business or personal, and Simon, who had testator's power of attorney, and Zahn took charge of them and did what was necessary with a minimum of consultation with their nonagenarian employer. Thus the ordering of the furnace by Simon does not stamp it as primarily concerned with the business. There is no intimation that the new furnace was not necessary or at

least an entirely reasonable installation from the standpoint of the building as a whole. The income-tax treatment of the depreciation of the previous furnace has little significance in the present situation, for then the testator operated the building as well as the business and there was no question of separate ownership.

3. *Bank account.* The checking account at the bank presents difficulties because of the fact that it served as the sole bank account for both the business and testator's nonbusiness activities. It appeared in evidence that shortly before testator's death $1,000 had been raised by liquidation of a personal investment and deposited in the bank account for the specific purpose of paying for the furnace installation. The trial court therefore held that $1,000 of the bank account should be treated as earmarked for a purpose other than the furniture and undertaking business, and therefore should not go to Simon. On the other hand, the court held that in view of the broad terms of the bequest of the business to Simon, and the fact that the business accounted for the great preponderance of the deposits in and withdrawals from the bank account, the remaining $1,324.44 in the bank account should pass to Simon as a part of the business.

We are unable to say that the trial court was wrong in its disposition of this asset. The codicil itself is not specific nor clear as applied to the bank account and we can only surmise what intention the testator would have manifested had his attention been directed to the specific question. The trial court's disposition of the item is logical and sensible, and we think entirely compatible with the terms of the codicil and with such evidence of testamentary intent as it contains. A business can hardly operate without a bank account and we would be slow to believe that a broad gift of a business was not intended to include the bank account used by the business. Nothing in the codicil negatives such an intention, and indeed

the language tends to confirm it. The codicil says that Simon is to have "the undertaking business, including *all property* and equipment used in connection therewith and the furniture business, including *all stock* . . . and to have title to *all accounts* due or to become due the furniture business or undertaking business." This is broad language, and while not conclusive as to the intention with respect to a bank account, it certainly affords support for the trial court's determination that Simon should take that part of the bank account not directly traced from testator's personal funds and earmarked for expenditure to augment the value of the real estate.

As to the $1,000, we think the trial court properly held that in view of its origin and purpose, the testamentary scheme to be derived from the will and codicil would best be served by using $785 of it to pay for the furnace and treating the balance as general funds of the estate, falling into the residue. Where the terms of a will are as blank as this codicil with respect to a particular item of property, it is largely fictional to talk of the testamentary intent thereby disclosed, for in truth no intent is shown. A decision has to be made, however, and the best that can be done is to find a solution which is compatible with the terms of the instrument, not incompatible with any expression or indication of intent therein contained, reasonably consistent with normal practices, and fair to all concerned. We think the trial court's solution meets these specifications, and no better one has been pointed out or occurs to us.

4. *Note at bank.* On August 1, 1955, testator borrowed $6,000 at a bank, gave his note therefor bearing interest at five per cent, and used the proceeds to pay cash for a shipment of mattresses. On September 12, 1955, he paid $2,000 on the note, and on October 25, 1955, another $1,000, in each case with funds derived from sales at the store. About that time the store was losing money and short of cash, so in-

stead of continuing to pay the note rapidly, it was renewed every six months, the last renewal being made on July 26, 1956, six months before testator's death. The bookkeeper, Zahn, testified that when the note was renewed Mr. Hahn had other assets free and clear and available to pay it, and the renewal "was just a question of borrowing rather than liquidating." The store had been losing money and "we hadn't been able to pay it out of the profits." He also testified that at the time of the last renewal he told testator that it was hoped to pay the note when an expected refund of taxes was received.

We approve the trial court's determination that this note was not one of the items to be paid by Simon under the provision of the codicil requiring him "to pay all outstanding accounts." Neither in the terminology of accounting nor in the common usage of the business world is a note evidencing the obligation to repay a bank loan generally referred to as an account. On the date the codicil was executed testator was obligated on a note to the bank for $8,000 borrowed to finance a program of improvement and expansion at the store, which note was increased to $15,000 in the following January. Thus testator must have been fully aware of notes at the bank, and had he intended Simon to pay any of them he presumably would have so provided more specifically than the direction that he pay all outstanding accounts. The codicil was witnessed and apparently drafted by an able and experienced lawyer, and it is unlikely he would have designated a note as an account, even though working in the haste that may be inferred from the fact that the codicil is written in pencil on a sheet of yellow scratch paper.

Much is made by appellants of the fact that the $3,000 note arose out of the purchase of merchandise for resale in the store. The merchandise account was certainly "an outstanding account" within the meaning of the codicil, and if

the original $6,000 note on which the money was borrowed to pay the account were now in question, there would be much force in appellants' contention. However, we agree with the trial court that the situation was materially changed when the note was repeatedly renewed for the reduced balance of $3,000 instead of being paid as the mattresses were sold. The renewals, made while Mr. Hahn had assets which could have been readily liquidated to pay the note, give support to the court's view that—

"The record seems to indicate that Hahn's intention in extending the due date of the note, was to have his general assets pay such note on his death."

Had he sold nonbusiness assets and paid the note before his death, the share of his estate passing to his residuary legatees would have been commensurately reduced. Directing the executor to pay the note out of the residue will leave the residuary legatees no worse off.

While the question is a close one, we are unable to say that the trial court erred in its disposition of the note item.

*By the Court.*—Judgment affirmed.